UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 4:22CR00300-25 JM |
| v. ) | |
| ) | |
| MARIO NICKSON ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S APPEAL
OF MAGISTRATE'S ORDER OF DETENTION**

The United States of America, by and through Jonathan D. Ross, United States Attorney for the Eastern District of Arkansas, and Julie Peters, Assistant U.S. Attorney for said district, for its response to defendant MARIO NICKSON's appeal (docket nos. 342, 389) of the magistrate's order of detention, respectfully states as follows.

I.    **Procedural Background**

On November 1, 2022, a federal grand jury returned an Indictment charging 35 defendants, including MARIO NICKSON, with a variety of drug trafficking and firearms offenses arising from an investigation in which multiple Title III wiretaps were authorized. Specifically, NICKSON and 34 codefendants were charged in Count 1 with conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 – as to NICKSON, those substances included cocaine and marijuana. NICKSON was also charged in Count 53 with use of a communications facility in furtherance of a drug trafficking crime, in violation of 21 U.S.C. § 843(b).

On November 22, 2022, NICKSON appeared before U.S. Magistrate Judge Joe J. Volpe for a detention hearing. Judge Volpe determined that NICKSON satisfied the burden of production and overcame the rebuttable presumption, but after hearing the government's evidence, found by clear and convincing evidence that NICKSON was a danger to the community, and no condition

or combination of conditions would reasonably assure the safety of the community. In issuing his order of detention (docket no. 207), the magistrate stated, "In coming to this conclusion, I have considered, *inter alia*, the nature and circumstances of the offense charged, Defendant's history of committing offenses while on state supervised release, and the unsuitability of the proposed release plan."

On December 24, 2022, NICKSON filed a motion for reconsideration and appeal of order of detention (docket no. 342), which he supplemented and amended on January 20, 2023 (docket no. 389).

## II.     Standard of Review

When [a] district court, pursuant to 18 U.S.C. § 3145(b), acts on a motion to revoke or amend a magistrate's pretrial detention order, the court acts de novo and makes an independent determination of the proper pretrial detention or conditions for release." *United States v. Maull*, 773 F.2d 1479, 1484 (8th Cir. 1985). "[T]he rule of de novo determination by the district court applies not only when the accused challenges the magistrate's order, but also when the government does, as it is authorized to do by section 3145(a)(1)." *Id*. (citing *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985)). In considering whether release or detention is appropriate, the district court must consider whether the defendant is a risk of flight or a danger to the community under the factors outlined in 18 U.S.C. § 3142(g), and then consider whether any conditions or combination of conditions of release will reasonably assure both the defendant's appearance and the community's safety under 18 U.S.C. § 3142(c) and (e). *United States v. Stenger*, 536 F. Supp.2d 1022, 1025 (S.D. Iowa 2008) (citing *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985)).

If the Court finds by a preponderance of the evidence that the defendant is a flight risk or

by clear and convincing evidence that the defendant is a danger to the community, the Court may detain the defendant. *Orta*, 760 F.2d at 891. The factors to be considered under 18 U.S.C. § 3142(g) include the nature and circumstances of the offense, the weight of the evidence, the history and characteristics of the person, and the nature and seriousness of the danger to persons in the community that would exist if the defendant was released. 18 U.S.C. § 3142(g).

Because of the nature of the charges against NICKSON, it is presumed that no condition or combination of conditions would reasonably assure his appearance or the safety of the community. 18 U.S.C. § 3142(e). "In a presumption case such as this, a defendant bears a limited burden of production-not a burden of persuasion-to rebut that presumption by coming forward with evidence he does not pose a danger to the community or a risk of flight. Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003) (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)). "Although a defendant's burden of production 'is not heavy,' he must introduce at least some evidence." *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir.1991); *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir.1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption."). *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

### III.    Factual Background of the Case

As demonstrated during the hearing, NICKSON is a danger to the community, and no condition or combination of conditions would reasonably assure the safety of the community. An overview of the case against NICKSON is as follows. On April 16, 2021, U.S. District Court Judge Kristine G. Baker authorized the interception of wire and electronic communications to and

from Target Phone 1, used by Freddie Gladney, Jr., for a period of 30 days. This wiretap revealed that Gladney Jr. and MARIO NICKSON were engaged in drug trafficking activity involving marijuana and cocaine.

For example, on May 13, 2021, at approximately 4:04 p.m., Session 4185 (TP1), NICKSON called Gladney. During this call, NICKSON stated he had some "strong" for $1000. Gladney stated "Get the fuck out of here for real?" and NICKSON responded that GLADNEY could flip it for $1500, referring to profiting $500 on one pound of marijuana. On May 14, 2021, at approximately 10:29 p.m., Session 4382 (TP1), Gladney called NICKSON. During this call, NICKSON wanted Gladney to come look at the marijuana, at $800 for a pound. Gladney asked if there were seeds in it, because of the low price. NICKSON told Gladney he would come down there tomorrow for Gladney to let him check it out, based on context, likely referring to meeting in Helena-West Helena or Tunica.

On May 15, 2021, at approximately 12:22 p.m., Session 4470 (TP1), NICKSON called Gladney. During this all, Gladney talked about being able to get kilograms of cocaine for $38,000 from someone in Jonesboro. NICKSON asked, "what that work looking like over there," referring to cocaine. Gladney stated, "You got some?" and NICKSON replies, "I got a little something."

On May 17, 2021, at approximately 1:32 p.m., Session 4802 (TP1), NICKSON called Gladney. During this call, NICKSON told a story about dealing with a drug dealer named "Tracy." NICKSON was going to buy 9 ounces of cocaine for $6000 and owe $3000. Tracy brought a whole kilogram and gave him half, which he didn't want, and Tracy was harassing NICKSON for the money when he didn't want the half kilo in the first place. NICKSON told GLADNEY JR. he gets them (kilograms) for $38,000. GLADNEY later tells a story about

4

someone who was going to bring him a half kilo and charge him $1100 an ounce. A draft transcription is as follows.

> FG: Damn right this your dude that have em?
> MN: This is Tracy's bitch ass. You know what saying? He came to holler at me like I was gon buy 9 from him right. So I had give him, I had 6,000 so I would have owed him a little more change like 3,000 more dollars or something like that. Let him bring that he come back with a half. You know what I'm saying. Well he came back with a whole one and I give him half the money for the motherfucker.
> FG: Right
> MN: Well I mean you know what I'm saying he came back with a whole one and he gave me half. But I dint' want a half you know what I'm saying.
> FG: Right
> MN: But the nigga be calling a nigga he got UI Man nigga taking so long this and this and that. And Man you ain't saving my ass nigga.
> FG: He don't even know. He don't even know.
> MN: He don't know cocksucker you ain't saving my ass I don't even [UI]. I didn't have none right. [UI] what I want to do is just buy me some to hold me out. I'll pay for it I won't owe him but 3. You know what I'm saying. I'll make that back that day. You can give him. You know what I'm saying.
> FG: Right
> MN: He come up with a half now he want to holler about why a nigga taking too long and he got to call. I remember the time you were getting the work you didn't want to call me let me know you had none bitch you know what I'm saying.
> FG: So so answer this question for me. What is it you get em for?
> MN: Like 38.
> FG: Okay good that's what I was saying. I got somebody that you can get a flat 38. [UI]
> MN: [UI] better than mine. You know what I'm saying.
> FG: Yeah this shit cheap man I'm telling you. I'm telling you this shit done got cheap. I got a bitch telling me I can bring around text she wanted to bring me a half down the other day. And tell me I'll give you two days to move it. I gone call you. She said, I said how much you want for it. She said just give me 1100 a piece for em. So I was going to charge me 1200 make me some off of em. God damn this shit too cheap now I don't like it when it's cheap.
> MN: Yeah yeah he got to call these niggas and holler bout [UI] or something. You know what I'm saying.

### IV. Testimony at the November 28, 2022 Detention Hearing

Proceeding first, the defense called NICKSON's wife, Patricia Nickson ("Patricia"), whom they offered as a third party custodian. Det. Hrg. Tr. at 8-9. Patricia testified that she and

5

NICKSON had been married for 19 years, and together for 20.  Tr. at 6.  Patricia has worked at a self-storage facility for 7.5 years, has an apartment in Memphis as a perk of the job, and she and NICKSON also live with NICKSON's mother in Tunica.  Tr. 6-7.  Patricia testified that NICKSON is disabled and draws disability.  Tr. at 7.

On cross-examination, it became apparent that Patricia had (or acknowledged) limited information about NICKSON's criminal history.   The Pretrial Services Report, which was made part of the record, reflects that NICKSON was convicted of two counts of the sale of marijuana (separate cases with offense dates of February 15, 2009, and February 12, 2010), and one count of possession of marijuana, in Tunica County Circuit Court on November 4, 2010.  On March 28, 2018, NICKSON was convicted of possession of a firearm by a felon in Tunica County Circuit Court arising from events on December 7, 2013.  On October 21, 2020, NICKSON was again convicted of being a felon in possession of a firearm in DeSoto County Circuit Court for an offense occurring on June 16, 2019.  Patricia was married to NICKSON during this entire time period.  Patricia denied ever seeing NICKSON with a gun, and denied knowing about any recent drug dealing.  Tr. at 11 & 14.

Patricia admitted that she had little control over NICKSON staying on the straight and narrow.  In response to a question by the magistrate, she stated, "Well, you you, you're not – I mean, we're married, but we're not together 24/7.  I don't know everything that he does.  I mean, I'm at work . . . . I try to monitor him.  You know, I can't monitor him as a child, but I would hope that he's doing, you know, what's right.  But you know, I can't watch him every minute to know what's what . . . if it's not there in my eyes to see, or whatever, I don't know that it's going on."  Tr. at 17.  Patricia further explained that even after 20 years together, she was not aware of illegal activity, recognizing that NICKSON could withhold information from her.  Tr. at 18.

6

Patricia explained that she had previously talked to him years ago about doing the right thing so that they could be together, but that NICKSON persisted in criminal activity. Tr. at 19, 20. Patricia also acknowledged that NICKSON was having health issues while engaging in criminal conduct. Tr. at 21.

During the government's case, Federal Bureau of Investigation (FBI) Special Agent Jefferson Highfill testified regarding some of the calls intercepted between NICKSON and Gladney Jr. (including those referenced above), placing them in context of what was learned about this drug trafficking conspiracy. During the time period of these calls, NICKSON was serving one year of intensive supervision/house arrest that began on October 23, 2020, following his Desoto County Circuit Court conviction for being a felon in possession of a firearm.

V.      Analysis

The magistrate judge correctly determined that NICKSON presented a danger to the community, and that no condition or combination of conditions would reasonably assure the safety of the community. NICKSON stands accused of trafficking in cocaine and marijuana, which are inherently dangerous substances. The proof of his participation is among the strongest available – his own words, recorded on a wiretap. NICKSON's history and character demonstrates a long pattern of drug and recent firearm activity. Further, NICKSON was on the equivalent of "house arrest" presumably living with Patricia, at the time he committed the offenses in this case. While the magistrate judge acknowledged that Patricia was honest and meant well, Tr. at 33-35, he lacked confidence that she could curtail NICKSON's criminal activity based on past experience.

NICKSON's first argument on appeal is that "the government presented no evidence whatsoever the defendant is a flight risk or a threat to the community if he were released subject to [] strict conditions." Doc. 389 at 1. The United States did not argue that NICKSON was a

risk of flight. However, ample evidence was presented that NICKSON is a danger to the community, as set forth in the transcript and summarized in this brief.

NICKSON's second argument is that he is having medical issues related to "chronic venous hypertension." NICKSON submitted medical records showing that he was seen at a wound care clinic in Senatobia, Mississippi, on March 14, 2022 and April 11, 2022. NICKSON represents that he has twice seen a doctor in Grant County for this condition, who advised he needs to be seen at a medical facility. Obviously, NICKSON is entitled to the appropriate medical care. The undersigned Assistant U.S. Attorney has requested that the U.S. Marshals Service provide an update on the medical care provided to NICKSON and investigate whether any additional care is needed. The United States will update the Court when this information is received. However, according to Patricia, the defendant's medical issues were present during the time period he engaged in criminal activity in this case. If they did not prevent him from engaging in drug trafficking activity then, they will not prevent it now.

WHEREFORE, the United States respectfully requests that the Court deny defendant MARIO NICKSON's detention appeal (docket nos. 342, 389).

Respectfully submitted,

JONATHAN D. ROSS
United States Attorney

JULIE PETERS
Bar No. AR2000109
Assistant United States Attorney
P.O. Box 1229
Little Rock, AR 72203
(501) 340-2600
Julie.Peters@usdoj.gov